# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL INDICTMENT NO.** |
| **v.** | : | **1:11-CR-136-JEC/AJB-06** |
| | : | |
| **HOLLY AUTRY,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT & RECOMMENDATION

Before the Court are Defendant Holly Autry's motions to suppress statements, [Docs. 142, 199]. The Court held an evidentiary hearing, [Doc. 414 (hereinafter T_ ], after which the parties filed briefs, [Docs. 419, 439, 449]. For the following reasons, the undersigned **RECOMMENDS** that the motions be **DENIED**.

### *Facts*

In late October or early November 2010, Henry County, Georgia, Narcotics Investigator Brian Ponder was investigating suspected marijuana grow houses at various addresses in Henry County, following a tip from Snapping Shoals EMC that the power bill at 925 Hemphill Road in Stockbridge had been about $1000 per month for several months, which was deemed excessive for a residence of that size. T16-17. As a result, officers surveilled that address, T17, and on November 3, 2010, the officers

smelled the odor of marijuana coming from the house, and heard blower systems from inside the house. T18. These observations, along with the high power bill, were deemed consistent with a marijuana grow house. *Id*. In conducting surveillance at that location, Ponder pulled into the driveway and saw an exhaust fan at the top of the residence spinning at a high rate speed and also smelled the odor of marijuana coming from the garage. *Id*. Surveillance units followed a pick-up truck[1] seen at 925 Hemphill to 166 Alexander Drive in McDonough. T19. Surveillance was conducted at 166 Alexander as well. *Id*.

Eventually, Ponder obtained search warrants for both 925 Hemphill and 166 Alexander. *Id*. In executing the warrant on November 3, 2010, at 166 Alexander, SWAT agents cleared the house, accompanied by 4 narcotics agents. T33. Most of the SWAT team left after they cleared the residence, with 5 or 6 remaining for security.[2] T34. When Ponder arrived at 166 Alexander after the residence was cleared, he saw Karry Autry ("Mr. Autry") at the bottom of the driveway seated on the bumper of his

---

[1]     Ponder described the pickup truck as a gray Chevy Silverado, with metal bed rails, a metal lift gate and a "Blue Monster" sticker on the back of the mirror. T20.

[2]     The SWAT officers possessed AR-15 or MP-5 weapons, which are automatic-type weapons which are larger than pistols and not easily or regularly concealed. T35.

2

vehicle.  Ponder had been told that Mr. Autry had invoked his right to an attorney after being *Mirandized*, but had supplied the searching officers with a garage door opener so they could make entry without force.  T21.  The officers located a room with a strong odor of marijuana, and Mr. Autry identified a button that when pushed allowed entry into the room.  *Id.*  Inside that room, police found 21 marijuana plants growing hydroponically in buckets; in the kitchen, they found vacuum sealers commonly used to package marijuana, packaged marijuana in the kitchen cabinets and a firearm; in the living room, they found burnt marijuana cigarettes; and in a bedroom, they found currency and packaged marijuana in suitcases.  T22.

Ponder asked Mr. Autry to call his wife, Holly Autry (Ms. Autry) (who was at work), and have her come to the residence.  T23.  Since Mr. Autry did not have a telephone, he used Ponder's.  Ponder heard Mr. Autry state into the phone for Ms. Autry to come home because police officers were at the house, and that they had found marijuana growing there "that she had no knowledge of."  T24.  She arrived at the house 45 minutes to an hour later.  T24.

Ponder and Investigator Edwards met Ms. Autry at the bottom of the driveway. Ponder identified himself and stated why they were there.  As the officers and Ms. Autry walked up the driveway to the garage, Ponder told her he wanted to question

3

her about items located in the house and therefore had to advise her of her *Miranda* rights. She was not handcuffed, but he advised her she was not free to leave. T24, 26. Ponder read *Miranda* warnings to Ms. Autry from a preprinted card (Gov't Ex. 1[3]). Ms. Autry stated she understood her rights and would talk to him without an attorney. T28-29.

Ponder did not recall exactly what Ms. Autry was wearing, other than to state she was dressed nicely, consistent with her job as an optometrist for Costco. T28. Ponder was dressed in plain clothes with his badge displayed, and while he was armed, his firearm was not visible under his shirt. T27. No other officers brandished or drew their

---

[3] Gov't Ex. 1 provides, in relevant part,

1. You have a right to remain silent.
2. Anything you say will be used in court as evidence against you.
3. you are entitled to have a lawyer now and have him present now or at anytime during the questioning.
4. If you cannot afford a lawyer, one will be appointed for you without cost and he may be present at all times during your questioning.
5. You can decide at any time to exercise these rights and nor answer any questions or make any statements.
6. Do you understand these rights?
7. Do you wish to talk with us without a lawyer?

weapons in her presence, nor were any narcotics dogs on the scene. T24-25.[4] Ms. Autry did not appear under the influence of alcohol or drugs, in need of emergency mental health treatment, or disoriented or confused. T25. Ponder spoke to her in a conversational tone and did not threaten her. T25. Ms. Autry was not patted down. T38.

Ponder questioned Ms. Autry for 15 to 30 minutes in the garage, primarily about how she could not have known marijuana was being grown in the house when the entire house smelled from the odor. T31, 39. Ms. Autry asked to use the restroom, and Ponder left her in the garage with another agent while he went to find a female agent, Sergeant Holly Perry, and tell her that Ms. Autry needed to use the restroom. T31. After he returned to the garage and was escorting Ms. Autry inside the home to the restroom, he showed her some of the items that were found in the kitchen, such as the marijuana packages, and the marijuana cigarettes from the living room. T31, 38. She followed him into the master bedroom, where he showed her the money and packaged marijuana that was found in the suitcases. T31, 51. Perry, who was searching the bedroom, also pointed out to Ms. Autry additional items found in the room. T51, 56.

---

[4] By the time Ms. Autry arrived, most of the SWAT officers had departed, and those who remained had their weapons slung toward the ground. No SWAT officer had contact with Ms. Autry. T44.

AO 72A
(Rev.8/8
2)

Ms. Autry stated that she knew her husband smoked marijuana, but not that he grew it.

T31.[5] At this point, Ms. Autry was crying, but according to Ponder, she did not appear

confused or disoriented. T30. Ponder turned Ms. Autry over to Perry. T32.

Perry already knew that Ponder had *Mirandized* Ms. Autry. T58. Perry then

walked with Ms. Autry down a short hallway to the master bathroom. She did not

touch her. T51-52. After they entered a small room that only contained a toilet, Perry

closed the door. Perry stood watch while Ms. Autry pulled down her pants and went

to the bathroom. T52, 55-56. Perry stated that she did not look directly at Ms. Autry

while she was relieving herself, but rather was looking for changes in Ms. Autry's

behavior which could indicate a threat to officer safety. T60. Perry acknowledged that

---

[5]     Ponder attributed the following statements made by Ms. Autry over the course of the interview that day: She had no knowledge of the hidden grow room, nor that her husband grew marijuana. In response to Ponder's question how could she not know, Ms. Autry stated that she worked nights and the hidden room could have been built at night. She denied smoking marijuana because that could cause her to lose her job. The guns that were located in the search were presents from her to her husband. She denied any knowledge of the marijuana at the house. When confronted with the grow house at 925 Hemphill, she stated she rented it to James McKenzie, who was her husband's friend. Although she initially denied being in that location, when told by Ponder that witnesses observed a car there similar to the one she arrived in, she stated she may have gone there to collect rent and other landlord duties, but then restated that she had never gone inside. She also denied that McKenzie lived at 166 Alexander, although she was told some of his belongings were found at that location. T40-42.

AO 72A
(Rev.8/8
2)

in the circumstances where an officer escorts a subject to the toilet, some people are uncomfortable so they talk, and if they do, she will respond. T57.

Perry testified that, for officer safety, the police would not allow someone unescorted access to the restroom. T55. At the same time, she did not perform a pat down of Ms. Autry. T61. The bathroom had been checked for weapons, but items which are not guns or knives can still pose a danger to officers. T61.

Ms. Autry told Perry she was an optician and was unaware of any of the items in the house. T53. Perry responded that she found it very difficult to believe that she did not know, due to the number of items in plain view. Ms. Autry replied that she worked long hours, and that she knew her husband, who did not have a job, smoked marijuana. T53.

After Ms. Autry finished in the restroom, Perry turned her back over to Ponder. Ponder did not have any more questions, although investigators assigned to the ATF had questions about some firearms. T31. As a result of the items found in the residence, both of the Autrys were arrested. T32.

7

***Contentions of the Parties***

Ms. Autry contends first that she did not voluntarily waive her *Miranda* rights. She contends that she could not be deemed to have made a voluntary choice since (1) she received a telephone call from her husband who reported that police directed that she needed to leave work and come home because the house was being searched; (2) when she arrived, her home was being searched by numerous police officers, some armed with large automatic weapons; and (3) she was approached by two officers who placed her in custody and advised her of her *Miranda* rights. [Doc. 419 at 4-5]. Next, she contends that her post-*Miranda* statements were not voluntarily obtained, because they were the product of coercive law enforcement techniques at the outset which continued through the "uncomfortable, inappropriate, and improper interrogation of Defendant while she used the bathroom." [*Id.* at 5-6]. She claims that law enforcement's rationale for escorting her to the bathroom is belied by the fact that the officers did not even feel a need to pat her down for weapons, and the bathroom already had been searched. [*Id.* at 6-7]. As a result, she argues, there was no reason why she could not have been allowed to perform the extremely private function of going to the bathroom alone -- other than, as Perry noted, an opportunity to take advantage of a

8

custodial suspect who is in an uncomfortable situation -- and therefore, her statements were not voluntary.  [*Id.* at 7-8].

In response, the government argues that the circumstances surrounding Ms. Autry's *Miranda* waiver were not coercive, in that she was approached by only two officers; Ponder was dressed in plain clothes and his weapon was not visible, and she did not have contact with the other officers at that time; Ponder advised her of *Miranda* warnings in a conversational tone; and she acknowledged that she understood those rights and was willing to speak to Ponder without a lawyer.  [Doc. 439 at 10-11].  The government next argues that Defendant has not shown that being questioned in the bathroom was a coercive technique,[6] nor was Ms. Autry subjected to any other coercive police techniques such as an exhaustingly long interrogation, application of physical force or the threat to do so, or the making of a promise that induced a confession.  [*Id.* at 11 (citation omitted)].  It points out that Ms. Autry was educated since she was employed as an optometrist; was not placed in handcuffs nor was she physically assaulted, threatened or promised a benefit; no firearms were pointed at her;

---

[6]     The government also points out that the statement made to Perry that she was aware of her husband's marijuana usage but not of his marijuana growing was cumulative of what she already told Ponder.  [Doc. 439 at 11].

no voices were raised towards her; and she was allowed to use the restroom. [*Id.*]. Thus, it contends, her statements were voluntary. [*Id.* at 12-13].

In reply, Ms. Autry argues that the government made certain factual misstatements in its response. First, she argues that the government mischaracterizes her husband's contacts with the police prior to her arrival. [Doc. 449 at 1-3]. Second, she argues that the government misstated the record when it claims that Perry's testimony establishes that Ms. Autry was never surrounded by officers. [Doc. 449 at 3]. Third, she argues that the government's claim that after being read her rights Ms. Autry stated, "yes, I understand my rights," is incorrect because the record does not support such a statement. [*Id.* at 4]. Fourth, she objects to the government's portrayal of her walking around the house looking at the items that were seized as voluntary, when it only occurred while Ponder continued to question her after she requested to use the restroom. [*Id.*]. Fifth, she contends that the government mischaracterized her statements about not being inside the Hemphill residence. [*Id.* at 5]. Finally, Ms. Autry argues that, contrary to the government's argument, Perry knew the coercive effect upon persons being observed by law enforcement while they were using the restroom, and used that technique to obtain more statements from her. [*Id.* at 5-6].

AO 72A
(Rev.8/8
2)

***Discussion***

*1.     Applicable Law*

There are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." *Dickerson v. United States*, 530 U.S. 428, 433 (2000); *United States v. Emanuel*, 440 Fed. Appx. 881, 886 (11th Cir. Sept. 21, 2011).  Therefore, the government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary.  *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.  Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983).  The government must prove by a preponderance of the evidence that the defendant waived her rights knowingly and voluntarily.  *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005).  An accused effectively waives her *Miranda* rights if she: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or

11

deception; and (2) makes her decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension. *United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585).

As to whether statements are voluntarily made, the focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or

12

the use of any promises or inducements by police. *See*, *e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11ᵗʰ Cir. 1996); *see also United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11ᵗʰ Cir. 2010) (noting that with respect to the admissibility of incriminatory statements and confessions made by a defendant to police, the court is to consider "the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary[, focusing] on whether the police overreached, considering factors such as the accused's lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep").

However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163

13

n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).

     2.    *Analysis*

The Court concludes that Ms. Autry intelligently and voluntarily waived her *Miranda* rights and her statements were otherwise voluntary.

Initially, the Court discusses Ms. Autry's contentions in her reply brief that the government mischaracterized facts in its responsive brief. First, even accepting as true Defendant's version of the facts of Mr. Autry's interaction with the police prior to her arrival, the Court fails to see the pertinence of such facts to the validity of her *Miranda* waiver and voluntariness of her statements, unless these facts were known to her at the time and affected her ability to properly waive her *Miranda* rights and make voluntary statements. *See Moran v. Burbine*, 475 U.S. 412, 422 (1986) ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."). Nothing in the record establishes that Ms. Autry was aware of Mr. Autry's interaction with the police prior to her arrival.

Second, as to her claim that the government incorrectly stated that Perry's testimony established that Ms. Autry was never surrounded by officers, the record

14

nonetheless shows that Ms. Autry was approached by two plain clothes investigators, Ponder and Edwards, T25-26; she had no direct contact with the SWAT officers still on the premises after she arrived, T44; and Perry observed Ms. Autry seated in the garage in the presence of one officer, and in her observations, she never saw Ms. Autry surrounded by any group of police officers, T49-50. Thus, the government's statement in its brief is correct.

Third, Ms. Autry's argument that the record does not reflect that after being read her rights Ms. Autry stated, "yes, I understand my rights," is technically correct but nonetheless a specious argument, since the transcript reflects the following during Ponder's direct examination:

Q. After reading the card in total, did you ask her if she fully understood her rights?

A. Yes.

Q. What was her response?

A. She said, yes, she understood her rights.

T28. There is no material difference for purposes of this case between the actual testimony and the representation by the government in its brief.

15

AO 72A (Rev.8/8 2)

Fourth, the Court agrees, and so found, *supra* at 5, that Ms. Autry was displayed the items found during the search after she asked to use the restroom.  Fifth, as to her claim that the government mischaracterized her statements about not being inside the Hemphill residence, such a claim is irrelevant to the issues of intelligent and voluntary *Miranda* waiver and voluntariness of her statements.  Rather, it is up to the jury to decide whether her statements to Ponder about her knowledge of the grow operation at Hemphill were truthful.

Turning to the merits, Ms. Autry intelligently and voluntarily waived her *Miranda* rights.  First, Ms. Autry was made aware of her *Miranda* warnings.  Ponder's recitation of the *Miranda* warnings was correct.  The *Miranda* opinion itself clearly sets out the required elements of the warnings which must be given to the custodial[7] suspect:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

---

[7]    There is no claim that Ms. Autry was not in custody, so the Court assumes that she was.

16

*Miranda*, 384 U.S. at 479. Ponder's advice tracked, if not exceeded, these warnings. Although the record does not reflect Ms. Autry's educational attainment, it does demonstrate that she was employed in optometry, a skilled profession, thus indicating a more than adequate level of intelligence to make a decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. As a result, the Court concludes that Ms. Autry was aware of and understood her *Miranda* rights and the consequences of waiving them. *Berghuis v. Thompkins,* 130 S. Ct. 2250, 2262 (2010); *Hall v. Thomas*, 611 F.3d 1259, 1285 (11th Cir. 2010).

Second, Ms. Autry voluntarily relinquished her *Miranda* rights, as her waiver was the product of a free and deliberate choice, rather than through intimidation, coercion or deception. Although she was advised by her husband that the police were searching the house and that he was directed by the police to tell her to come to the house, there is no evidence that this decision was not a freely made one. There was no evidence how far away from the house Ms. Autry was when her husband called her, so the 45 to 60 minute delay before she arrived certainly shows there was enough time for Ms. Autry to consider her options. When she arrived at her residence, she was met by two officers dressed in plain clothes; no weapons were pointed at her; she was not

AO 72A
(Rev.8/8
2)

touched or patted down; and she was spoken to in a conversational tone. She was not disoriented, confused or under the influence of any substances. (In fact, she later told Ponder she could lose her job if she used drugs.) She was advised of her constitutional rights, stated that she understood those rights, and agreed to talk to Ponder without the presence of a lawyer. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."); *Bernal-Benitez*, 594 F.3d at 1319. In short, the totality of circumstances demonstrate that there was no police coercion to get her to waive her *Miranda* rights, a prerequisite to finding an involuntary waiver. *See e.g., Connelly*, 479 U.S. at 163-64; *Moran v. Burbine*, 475 U.S. 412, 422 (1986). Nor is there any evidence of deception on the part of the police to get her to waive her *Miranda* rights.

The government also established that her statements were voluntary under the totality of the circumstances. First, Ms. Autry certainly was not suffering from low intellect, since she was employed as an optometrist. Second, although she was detained, no officer physically restrained or touch her. Third, at the time she made any statements, she had not been in custody (if at all) for more than one hour. Fourth,

18

similarly, she was questioned for less than one hour, which is not an unduly long period of time. *See Hall*, 611 F.3d at 1289 (interrogation for a little over one hour not an extended period of time). Fifth, she was not threatened or promised any benefit for speaking with law enforcement.

The gist of Ms. Autry's argument is that her statements were rendered involuntary because, after she requested to use the restroom, Ponder first walked her around the house and showed her the items which had been located, and second, Perry went into the restroom with her knowing that her discomfort with the situation would likely lead her to make additional statements. Singularly and together, the Court does not find that these actions rendered Ms. Autry's statements involuntary. First, any delay in Ponder taking Ms. Autry to the bathroom was not unduly long. There is no evidence that, other than requesting to use the restroom, Ms. Autry was in distress or suffered from any condition that made any short delay in fulfilling her request sufficient to overbear her will. Nor is there any evidence that she made repeated requests to Ponder to use the restroom which were disallowed or ignored; the record only demonstrates one request to use the restroom, which was honored shortly thereafter.

Second, as to Perry's actions, Perry had reasonable security concerns justifying her accompanying Ms. Autry to the restroom. The investigation had revealed multiple

19

marijuana grow houses and in this particular home, firearms. Ms. Autry was in her own home, so that while the bathroom had previously been searched for weapons, Perry could not be certain what were Ms. Autry's intentions. Further, Ms. Autry does not cite to a case, and the Court has found none, which supports her assertion that interviewing a custodial suspect in the bathroom after *Miranda* rights have been waived renders a statement involuntary.[8] More importantly, Perry did not take unreasonable advantage of Ms. Autry's privacy. She did not look directly at Ms. Autry while she partially disrobed and relieved herself. In fact, the evidence does not show that Perry asked her any questions or made any statements to Ms. Autry in the restroom until Ms. Autry stated that she was (according to Perry) an optician and was unaware of her husband's activities. T53. Under the totality of the circumstances, the Court concludes that

---

[8]      Other cases have concluded that interviewing a suspect in a restroom, without more, did not render the defendant's statements involuntary. *United States v. Glauning*, 211 F.3d 1085, 1087 (8th Cir. 2000); *United States v. Buckley*, 4 F.3d 552, 560 (7th Cir. 1993). On the other hand, at least one court has found a civil rights violation where an officer watched a detainee/inmate urinating where the offense for which the detainee was detained (being a passenger in a stolen car) did not give rise to a reasonable basis to believe she would destroy evidence or harm the officer, and she had already been patted down. *See DiLoreto v. Borough of Oaklyn*, 744 F. Supp. 610, 620-22 (D.N.J. 1990). In the present case, Ms. Autry was detained for the marijuana grow house and the firearms located in her residence, and had not been patted down. Therefore, *DiLoreto* is distinguishable from this case.

AO 72A
(Rev.8/8
2)

Perry's questioning of Ms. Autry while Ms. Autry was using the restroom rendered her statements involuntary.

### *Conclusion*

For the reasons stated above, the undersigned **RECOMMENDS** that Holly Autry's motions to suppress statements, [Docs. 142, 199], be **DENIED**.

**IT IS SO RECOMMENDED**, this the    10th    day of October, 2012.

    _____

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)